# EXHIBIT A

# PURCHASE AGREEMENT

THIS **PURCHASE AGREEMENT** ("**Agreement**") is made as of date of execution and delivery of a copy of this Agreement by the last of Buyer and Seller to do so ("**Effective Date**") by and between **CMK GROUP, LLC**, an Illinois limited liability company, or its assignee or nominee ("**Buyer**") and **800 SOUTH WELLS PHASE II, LLC**, an Illinois limited liability company ("**Seller**").

Subject to the terms and conditions of this Agreement, Seller agrees to sell and Buyer agrees to buy that certain parcel of real property legally described on Exhibit A attached hereto and hereby made a part hereof, together with all hereditaments and appurtenances pertaining to such tract and all improvements located thereon, including without limitation all of Seller's right, title, and interest in and to adjacent streets, alleys, and rights-of-way, and any riparian rights appurtenant thereto (collectively the "**Property**").

1. **PURCHASE PRICE/POSSESSION**. The purchase price of the Property (the "**Purchase Price**") shall be **Four Million Eight Hundred Seventy Two Thousand and 00/100 Dollars ($4,872,000.00)**, plus or minus prorations as herein provided. The Purchase Price shall be payable in cash or certified or cashier's check or by wire transfer on the Closing Date (as herein defined), at which time Seller shall deliver exclusive possession of the Property to Buyer. The purchase of the Property is subject to all of the conditions contained hereinbelow.

2. **EARNEST MONEY**. Within three (3) business days following the Effective Date, Buyer shall deposit a sum equal to **five percent (5%)** of the Purchase Price ("**Earnest Money**") in a joint order escrow account with Near North National Title LLC ("**Title Company**"), under the Title Company's customary form of strict joint order escrow instructions.

3. **ESCROW CLOSING**. The consummation of the transaction described in this Agreement ("**Closing**") shall occur by means of an escrow with the Title Company in accordance with the general provisions of the usual forms of deed and money escrow agreement then in use by the Title Company, with such special provisions inserted in the escrow agreement as may be required to conform to this Agreement. Upon the creation of such escrow, anything herein to the contrary notwithstanding, payment of the Purchase Price and delivery of the deed shall be made through the escrow and any and all sums paid to Seller by Buyer prior to Closing shall be deposited in the escrow or credited against the Purchase Price payable at Closing. The cost of the escrow shall be divided equally between Seller and Buyer.

4. **CLOSING DATE**. Provided that Buyer has not terminated this Agreement pursuant to a right to do so contained herein, and provided that all other covenants and conditions herein contained on the part of Seller have been complied with, the closing of the transaction which is the subject of this Agreement (the "**Closing**") shall occur **fifteen (15) days** following the entry of an order of the Bankruptcy Court having jurisdiction over Seller and the Property approving this Agreement (the "**Closing Date**").

5. **DOCUMENTS TO BE DELIVERED BY SELLER**. Within ten (10) business days from the Effective Date, Seller shall deliver to Buyer copies of the following to the extent in Seller's possession or under its control (collectively, the "**Property Information**"):

(a) A current title commitment for the Property issued by the Title Company with copies of all recorded documents (collectively, the "**Title Documents**");

(b) A plat of survey for the Property showing the boundaries and location of all existing improvements on the Property as well as all easements, confirming the legal description;

(c) Any engineering and environmental reports in Seller's possession;

(d) Copies of current tax bills and documents relating to tax or assessment proceedings, abatements, exemptions, or notices;

(e) Copies of any written notices from the City of Chicago, County of Cook, the State of Illinois or any governmental entity of code violations; and

(f) Any other documents reasonably requested by Buyer or known by Seller to materially affect said Property.

Except as otherwise expressly provided herein, Seller makes no representation or warranties as to the accuracy or completeness of any of the Property Information.

6. **BUYER ACCESS TO PROPERTY**. From and after the Effective Date, Buyer shall have the right to enter onto the Property to conduct and make such studies as Buyer deems reasonably necessary, at Buyer's sole expense, including but not limited to engineering studies, soil analysis, core drilling, zoning studies, mechanical studies, tunnel studies, sewer studies, environmental and ecological studies, economic studies, any and all other physical inspections of the Property (collectively, the "**Due Diligence Materials**"). Seller shall cooperate with Buyer in making such inspections and allow Buyer full access to the Property for the purpose of such inspections. Buyer shall notify Seller in advance of making any such inspections. Buyer shall indemnify Seller against any property damage or personal injury arising from any such inspections. Prior to entering the Property for the purposes of conducting any such tests or inspections, Buyer shall provide Seller with evidence of general liability insurance naming Seller as an additional insured and reasonably acceptable to Seller.

7. **BUYER'S RELIANCE ON ITS INVESTIGATIONS**. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES IN PARAGRAPH 8 OF THIS AGREEMENT AND ANY WARRANTIES OF TITLE CONTAINED IN THE DEED DELIVERED AT THE CLOSING ("SELLER'S WARRANTIES"), THIS SALE IS MADE AND WILL BE MADE WITHOUT REPRESENTATION, COVENANT, OR WARRANTY OF ANY KIND (WHETHER EXPRESS, IMPLIED, OR, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, STATUTORY) BY SELLER. AS A MATERIAL PART OF THE CONSIDERATION FOR THIS

AGREEMENT, BUYER AGREES TO ACCEPT THE PROPERTY ON AN "AS IS" AND "WHERE IS" BASIS, WITH ALL FAULTS, AND WITHOUT ANY REPRESENTATION OR WARRANTY, ALL OF WHICH SELLER HEREBY DISCLAIMS, EXCEPT FOR SELLER'S WARRANTIES. EXCEPT FOR SELLER'S WARRANTIES, NO WARRANTY OR REPRESENTATION IS MADE BY SELLER AS TO FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY, DESIGN, QUALITY, CONDITION, OPERATION OR INCOME, COMPLIANCE WITH DRAWINGS OR SPECIFICATIONS, ABSENCE OF DEFECTS, ABSENCE OF HAZARDOUS OR TOXIC SUBSTANCES, ABSENCE OF FAULTS, FLOODING, OR COMPLIANCE WITH LAWS AND REGULATIONS INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO HEALTH, SAFETY, AND THE ENVIRONMENT. BUYER ACKNOWLEDGES THAT BUYER HAS ENTERED INTO THIS AGREEMENT WITH THE INTENTION OF MAKING AND RELYING UPON ITS OWN INVESTIGATION OF THE PHYSICAL, ENVIRONMENTAL, ECONOMIC USE, COMPLIANCE, AND LEGAL CONDITION OF THE PROPERTY AND THAT BUYER IS NOT NOW RELYING, AND WILL NOT LATER RELY, UPON ANY REPRESENTATIONS AND WARRANTIES MADE BY SELLER OR ANYONE ACTING OR CLAIMING TO ACT, BY, THROUGH OR UNDER OR ON SELLER'S BEHALF CONCERNING THE PROPERTY, EXCEPT FOR SELLER'S WARRANTIES. THE PROVISIONS OF THIS PARAGRAPH 7 SHALL SURVIVE INDEFINITELY ANY CLOSING OR TERMINATION OF THIS AGREEMENT AND SHALL NOT BE MERGED INTO THE CLOSING DOCUMENTS.

8. **REPRESENTATIONS, WARRANTIES AND COVENANTS**. Seller represents, warrants and covenants to Buyer that, to Seller's knowledge, as of the Effective Date hereof and the Closing Date:

(a) Except for (i) that certain Management Agreement (the "**Management Agreement**"), dated as of the 1st day of January, 2002, by and between Seller as Owner and Standard Parking Corporation, an Illinois corporation, as Operator, (ii) that certain Easement Agreement for Retaining Wall to be entered into by and among Seller, River City Private Residences Condominium Association, an Illinois not-for-profit corporation, WRT-Marc RC, LLC, an Illinois limited liability company, and River City Marina Facilities, L.L.C., an Illinois limited liability company, subject to Buyer's reasonable approval, and recorded following Court Approval (as such term is hereinafter defined), and/or (iii) as disclosed in any of the Title Documents, there are no written leases, service contracts, maintenance agreements, management agreements or other operating agreements affecting all or any portion of the Property and there are no written agreements or commitments between Seller and any occupant or user of the Property affecting all or any portion of the Property.

(b) There are no outstanding options to purchase or options to lease or any rights of first refusal or rights of first offer for all or any portion of the Property.

(c) Except as otherwise disclosed to Buyer in writing, Seller is not a party to any written agreement with any person, firm, corporation or other entity that has any right or option to acquire the Property or any portion thereof.

(d) There is not pending, nor has Seller received a written threat from a public authority, of a contemplated condemnation of the Property or any part thereof.

(e) Seller's execution of and performance under this Agreement does not constitute a breach of any written agreement, order, judgment or decree to which Seller is a party or by which any part of the Property is or may be bound.

(f) Seller will not transfer the Property except as herein expressly contemplated, nor except as otherwise disclosed to Buyer in writing, hereafter create any easements, liens, mortgages, or other encumbrances with respect to the Property, except with Buyer's prior written consent. Seller shall maintain the Property in as good condition and repair as exists on the Effective Date.

(g) Seller has not received any written notice from any governmental entity that the environmental and ecological condition of the Property is in violation in any material respect of any law, ordinance, rule or regulation applicable thereto.

The continued validity in all material respects of all representations, covenants and warranties set forth in this Agreement shall be a condition precedent to the performance of Buyer's obligations hereunder.

"Seller's knowledge," as used in this Agreement means the current actual knowledge of Nicholas Gouletas, without any duty of inquiry or investigation.

In the event of a material breach of any representation or warranty by Seller known to Buyer before Closing, Buyer may, at Buyer's election, (i) terminate this Agreement and receive a refund of the Earnest Money; or (ii) proceed with the Closing, in which case Seller shall have no liability for such breach.

9. **CONDITIONS PRECEDENT**. This Agreement and Buyer's obligation to close are subject to the following additional express conditions precedent set forth below:

(a) the continued validity of each and all of the representations, warranties and covenants of Seller contained in this Agreement in all material respects; and

(b) the delivery of the documents required to be delivered by Seller at Closing as described in this Agreement.

Notwithstanding anything to the contrary which may be contained herein, each of the conditions precedent may be waived in writing by Buyer, such conditions being intended for the exclusive protection and benefit of Buyer. If any of the conditions precedent to Buyer's obligations set forth in this Paragraph 9 or elsewhere in the Agreement are not fulfilled at or within the times set forth herein for the fulfillment thereof (after any applicable cure period), or not otherwise waived in writing by Buyer, Buyer may terminate this Agreement by notice to Seller, in which event the Earnest Money, and any accrued interest thereon, shall be refunded to Buyer and this Agreement shall thereupon become null and void and of no further force and effect:

10. **PRORATIONS**. *Ad valorem* real estate taxes for the year of Closing (and, if applicable, the year prior thereto) shall be prorated at Closing effective as of the Closing Date. If Closing occurs before the tax rate is fixed for the year of Closing and/or the year prior thereto, the apportionment of taxes for the year prior to Closing and/or the apportionment of taxes for the year of Closing will be based upon an estimated tax equal to one hundred ten percent (110%) of the most recently ascertainable assessed valuation, tax rate and state equalization factor. All prorations shall be final. All special taxes or assessments through the Closing Date shall also be paid by Seller. Seller shall pay the taxes imposed by State of Illinois and Cook County law on the transfer of title and Seller and Buyer shall each pay the portion of the tax imposed by City of Chicago imposed on each party by the ordinance establishing same (*i.e.* Seller shall pay $3.00 per $1,000 of the Purchase Price and Buyer shall pay $7.50 per $1,000 of the Purchase Price). Seller and Buyer shall execute completed Real Estate Transfer Declarations in the forms required by the State of Illinois, the County of Cook and the City of Chicago, and Seller shall satisfy any other requirements imposed by the State of Illinois, the County of Cook and the City of Chicago with respect to such transfer taxes.

11. **DEED/CLOSING MECHANICS**. At Closing, Seller shall deliver to Buyer the following items, which items shall be in form and substance satisfactory to Buyer:

(a) an Owner's ALTA Policy of Title Insurance Form B, issued by the Title Company in Buyer's favor in the full amount of the Purchase Price, insuring Buyer's fee simple title to the Property in the form required under Paragraph 3, with extended coverage,;

(b) a Special Warranty Deed (the "**Deed**"), in form suitable for recording, conveying good and marketable fee simple title to the Property to Buyer, free and clear of all liens and encumbrances subject only to the exceptions set forth on Exhibit B attached hereto and hereby made a part hereof and such additional Title Documents as may be approved by Buyer prior to Closing, which such approval shall not be unreasonably withheld, conditioned or delayed (the "**Permitted Exceptions**");

(c) exclusive possession of the Property;

(d) such executed documents as are necessary or appropriate to allow Buyer to comply with Section 1445 of the Internal Revenue Code regarding tax withholding on the sale of U.S. real property by a foreign person or such executed certificates or affidavits as are appropriate regarding exemption from such requirements; and

(e) such other executed documents or instruments as in the reasonable opinion of counsel for Buyer or the Title Company may be necessary or desirable to effectuate Closing.

12. **DEED/CLOSING MECHANICS - BUYER**. On or prior to the Closing Date, or as otherwise provided, Buyer shall do or perform the following:

(a) cause to be delivered to Seller the Earnest Money and the balance of the Purchase Price; and

(b) execute and deliver such other documents or instruments as in the reasonable opinion of counsel for Seller or the Title Company may be necessary or desirable to effectuate Closing.

13. **DEFAULT**.

(a) If Seller is unable to convey title to the Property in accordance with the condition in this Agreement, if there has occurred a material breach of any of Seller's representations, warranties, and/or covenants, or if the conditions precedent to Buyer's performance specified herein have neither been satisfied nor waived by Buyer, or if Seller fails to consummate this Agreement for any reason (other than Buyer's default, or a termination of this Agreement by Buyer pursuant to a right to do so expressly provided for in this Agreement or the failure to obtain Court Approval, as such term is hereinafter defined, notwithstanding diligent good-faith efforts by Seller to obtain Court Approval), Buyer may, at Buyer's sole option, (a) terminate this Agreement by written notice to Seller and receive a refund of the Earnest Money; or (b) seek to enforce this Agreement by an action for specific performance, as Buyer's sole and exclusive remedy, which such action must be brought within ninety (90) days of Seller's default, to the extent permitted by applicable law, Buyer waiving the right to bring suit for specific performance at any later date. Notwithstanding the foregoing or any other provision contained herein to the contrary, it is hereby acknowledged and agreed that the failure to obtain Court Approval (as such term is hereinafter defined) of this Agreement and the transaction contemplated hereby for whatever reason (other than Seller' failure to utilize diligent good-faith efforts to obtain Court Approval) shall not be deemed a default by Seller hereunder and shall entitle Buyer to refund of the Earnest Money as its sole recourse.

(b) If Buyer fails to consummate this Agreement for any reason (other than Seller's default or a termination of this Agreement by Seller or Buyer pursuant to a right to do so expressly provided for in this Agreement), Seller may, as Seller's sole and exclusive remedy, and in lieu of any other remedy, legal or equitable in nature, retain the Earnest Money as and for liquidated damages and not as a penalty, the parties hereto acknowledging and agreeing that actual damages resulting from any such default would be difficult if not impossible to calculate and that the amount of the Earnest Money reasonably approximates the amount of such damages.

(c) Notwithstanding the provisions above, no default by either party hereto shall result in a termination or limitation of any rights of such party hereunder unless and until the other party shall have notified the defaulting party in writing of said default.

14. **REAL ESTATE COMMISSION**. Buyer and Seller represent and warrant to each other that neither Buyer nor Seller has dealt with any broker in connection with, and that no broker was the procuring cause of the transaction contemplated by this Agreement, other than Millennium Properties and Dirk Riekse/Cushman & Wakefield (collectively "**Broker**"). Seller shall pay all commissions due and owing Broker in connection with the execution and/or consummation of this Agreement. The commissions due and owing Broker shall not exceed five percent (5%) of the Purchase Price in the aggregate and shall be shared by Millennium Properties and Dirk Riekse/Cushman & Wakefield in such proportion as such brokers may agree. Seller agrees to protect, defend, indemnify and hold harmless Buyer, Buyer's successors and assigns, from and against any and all obligation, cost, expense and liability, including without limitation, all reasonable attorney's fees and court costs, arising out of any claim for brokerage commission, finder's commission or other such compensation by any party as a result of the dealings of Seller in connection with this Agreement. Buyer agrees to protect, defend, indemnify and hold harmless Seller, Seller's successors and assigns, from and against any and all obligation, cost, expense and liability, including without limitation, all reasonable attorney's fees and court costs, arising out of any claim for brokerage commission, finder's commission or other such compensation by any party (other than Broker) as a result of the dealings of Buyer in connection with this Agreement.

15. **MISCELLANEOUS PROVISIONS**.

(a) **Assignment**. Buyer may assign Buyer's rights in this Agreement to any entity partially or wholly owned or controlled by Colin M. Kihnke, without Seller's prior written consent, but no such assignment shall be effective against Seller until a copy of a written assignment agreement between Buyer and its assignee which includes an express assumption of all Buyer obligations hereunder by Buyer's assignee is delivered to Seller. Except as set forth hereinabove, Buyer may not assign Buyer's rights in this Agreement without Seller's prior written consent.

(b) **Notices**. All notices required or desired to be given hereunder shall be deemed given if and when delivered personally, or on the next business day after being deposited with a national overnight courier service, or on the next business day after being deposited in the United States certified or registered mail, return receipt requested, postage prepaid, or upon receipt of a facsimile transmission with a confirmation delivered by regular mail, addressed to the party at its address set forth below, or to such other address as the party to receive such notice may have designated to all other parties by notice in accordance herewith:

If to Buyer: 225 West Ohio Street
Chicago, Illinois 60654
Attention: Colin M. Kihnke
FAX: (312) 376-2056

| | |
|---|---|
| With a copy to: | Schain, Banks, Kenny & Schwartz, Ltd.<br>70 West Madison Street<br>Suite 5300<br>Chicago, Illinois 60602<br>Attention: David J. O'Keefe, Esq.<br>FAX: (312) 345-5701 |
| If to Seller: | 182 West Lake Street<br>Suite 200<br>Chicago, Illinois 60601<br>Attention: Nicholas Gouletas<br>FAX: (312) _____ |
| With a copy to: | Millennium Properties R/E<br>200 West Madison Street<br>36th Floor<br>Chicago, Illinois 60606<br>Attention: Daniel J. Hyman<br>FAX: (312) 264-0540 |
| With a copy to: | Goldstein & McClintock LLLP<br>208 South LaSalle Street<br>Suite 1750<br>Chicago, Illinois 60604<br>Attention: Harold D. Israel, Esq.<br>FAX: (312) 277-2310 |
| With a copy to: | DLA Piper LLP (US)<br>203 North LaSalle Street<br>Suite 1900<br>Chicago, Illinois 60601<br>Attention: Elizabeth H. Friedgut, Esq.<br>FAX: (312) 630-5341 |

(c) **Entire Agreement**. This Agreement constitutes the entire agreement between Seller and Buyer, and there are no other covenants, agreements, promises, terms, provisions, conditions, undertakings, or understandings, either oral or written, between them concerning the Property other than those herein set forth. No subsequent alteration, amendment, change, deletion or addition to this Agreement shall be binding upon Seller or Buyer unless in writing and signed by both Seller and Buyer.

(d) **Headings**. The headings, captions, numbering system, etc., are inserted only as a matter of convenience and may under no circumstances be considered in interpreting the provisions of the Agreement.

(e) **Binding Effect**. All of the provisions of this Agreement are hereby made binding upon the personal representatives, heirs, successors, and assigns of both parties hereto.

(f) **Time of Essence**. Time is of the essence of this Agreement.

(g) **Unenforceable or Inapplicable Provisions**. If any provision hereof is for any reason unenforceable or inapplicable, the other provisions hereof will remain in full force and effect in the same manner as if such unenforceable or inapplicable provision had never been contained herein.

(h) **Counterparts**. This Agreement may be executed in any number of counterparts, each of which will for all purposes be deemed to be an original, and all of which are identical.

(i) **Applicable Law, Place of Performance**. This Agreement shall be construed under and in accordance with the laws of the State of Illinois. All obligations contained in this Agreement are to be performed in Cook County, State of Illinois.

(j) **Buyer's Waiver of Conditions Precedent**. Buyer may, at Buyer's sole option, waive any of the conditions precedent to Buyer's performance specified in this Agreement by giving written notice to Seller at any time on or before the Closing Date.

(k) **Survival Clause**. Unless otherwise expressly stated in this Agreement, each of the covenants, obligations, representations, and agreements contained in this Agreement shall survive the Closing and the execution and delivery of the Deed required hereunder only for a period of twelve (12) months immediately following the Closing Date. Any claim brought after Closing based upon a material misrepresentation or a material breach of a warranty contained in Paragraph 8 of this Agreement or material breach of any of the other covenants, obligations or agreements contained herein shall be actionable or enforceable, subject to the notice and cure provisions set forth in Paragraph 13 hereof, if and only if written notice of any such claim is given within six (6) months after Closing to the party which allegedly made any such material misrepresentation or breached in any material respect any such covenant, obligation, warranty or agreement.

(l) **No Third Party Beneficiary**. This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third party beneficiary, decree, or otherwise.

(m) **Closing Date**. In the event that the Closing Date or any other deadline date described in this Agreement falls on a weekend or a holiday, the Closing Date or other deadline date shall be deemed to be the next business day.

(n) **Execution by Seller.** The person(s) executing this Agreement on behalf of Seller hereby represent and warrant (i) that such persons are duly authorized to do so and subject to Court Approval (as such term is hereinafter defined), have all necessary legal authority to and by such execution do hereby, bind Seller to the terms hereof; and (ii) hereby indemnify Buyer from and against any loss or damage resulting from any inaccuracy in the foregoing representation.

(o) **Attorneys' Fees and Costs.** In the event legal action is instituted to interpret or enforce the provisions of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party the prevailing party's costs and attorney's fees, including, without limitation, all costs and fees that are incurred in any trial, on any appeal and/or in any bankruptcy proceeding.

(p) **Break-Up Fee.** The parties hereby acknowledge and agree that Seller and the Property are currently subject to a chapter 11 bankruptcy case pending in the United States Bankruptcy Court for the Northern District of Illinois, and that the offer contained in this Agreement is or may be subject to the review and approval of said Court (the "**Court Approval**") and may give rise to or result in a competitive bidding process or auction in which other parties can make offers for the purchase of the Property. If, in the course of any competitive bidding or auction conducted by the Court, any party other than Buyer is successful in obtaining the approval of the Court with respect to such party's offer and as a result Buyer is unable to acquire the Property, Buyer shall thereupon be entitled to a fee in consideration of the lost opportunity arising from Buyer's inability to acquire the Property in an amount equal to three percent (3%) of the Purchase Price ("**Break-Up Fee**"). In the event Buyer becomes entitled to the Break-Up Fee, Buyer shall have the right to record a memorandum of this Agreement against the Property memorializing Buyer's right to the Break-Up Fee and shall cause such memorandum to be released upon receipt of the Break-Up Fee. The obligation of Seller to pay the Break-Up Fee shall survive any termination of this Agreement.

(q) **Tax Deferred Exchange.** Either party may elect to exchange, for other property of like kind and qualifying use within the meaning of Section 1031 of the Internal Revenue Code of 1986, as amended, title in the Property. Each party expressly reserves the right to assign its rights, but not its obligations, hereunder to a qualified intermediary as provided in Internal Revenue Code Reg. 1.103(k)-1(g)(4) on or before the Closing Date. The parties agree to reasonably cooperate fully with each other to accomplish such an exchange provided that the cooperating party shall not be subject to any cost or liability as a result of such like kind exchange. The exchanging party shall pay all costs and advance all funds required in connection with such exchange and shall indemnify, defend, and hold the cooperating party harmless from all claims, damages, liabilities, costs and expenses (including, but not limited to reasonable legal fees) in connection with such exchange. The cooperating party shall in no event be required to take title to the exchanged property. The provisions of this subsection 15(q) shall survive the Closing or any earlier termination of this Agreement.

(r) **Waiver of Jury Trial**. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN.

(s) **Limitation of Liability**. Notice is hereby given that all persons dealing with Seller shall look to the assets of Seller for the enforcement of any claim against Seller, as none of the managers or members of Seller assume any personal liability for obligations entered into by or on behalf of Seller.

(t) **Entirety and Amendments**. This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property except for any confidentiality agreement binding on Buyer, which shall not be superseded by this Agreement. This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

*[BALANCE OF PAGE INTENTIONALLY LEFT BLANK –
SIGNATURES APPEAR ON FOLLOWING PAGE]*

**SELLER:**

**800 SOUTH WELLS PHASE II, LLC**, an Illinois limited liability company

By: ___[signature]_____
      **Nicholas S. Gouletas**, Manager
Date: _____


**BUYER:**

**CMK GROUP, LLC**, an Illinois limited liability company

By: _____
      **Colin M. Kihnke**, Manager
Date: _____

F

**SELLER:**

**800 SOUTH WELLS PHASE II, LLC**, an Illinois limited liability company

By:_____
       **Nicholas S. Gouletas**, Manager

Date: _____

**BUYER:**

**CMK GROUP, LLC**, an Illinois limited liability company

By:_____
       **Colin M. Kihnke**, Manager

Date: ____10/24/14_____

# EXHIBIT A

## LEGAL DESCRIPTION

THAT PART OF BLOCKS 85 AND 86 IN THE SCHOOL SECTION ADDITION TO CHICAGO, BEING A SUBDIVISION OF SECTION 16,TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN AND OF THE FILLED OLD CHANNEL OF THE SOUTH BRANCH OF THE CHICAGO RIVER, ALL TAKEN AS TRACT, DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE EAST LINE OF BLOCK 86 AFORESAID WITH THE SOUTH LINE OF WEST POLK STREET; THENCE NORTH 89 DEGREES 53 MINUTES 33 SECONDS WEST, ALONG THE SOUTH LINE OF WEST POLK STREET, 10.00 FEET TO A POINT ON THE WEST LINE OF SOUTH WELLS STREET (SAID WEST LINE DRAWN 10.00 FEET WEST OF AND PARALLEL WITH THE AFOREMENTIONED EAST LINE OF BLOCK 86); THENCE SOUTH 0 DEGREES 03 MINUTES 37 SECONDS EAST ALONG THE WEST LINE OF SOUTH WELLS STREET AFORESAID, 388.20 FEET TO THE POINT OF BEGINNING OF THE PARCEL HEREIN DESCRIBED; THENCE SOUTH 89 DEGREES 56 MINUTES 23 SECONDS WEST PERPENDICULAR TO THE LAST DESCRIBED LINE, 199.78 FEET TO A POINT ON A LINE DRAWN 1.51 FEET (AS MEASURED PERPENDICULARLY) EAST OF AND PARALLEL WITH THE EASTERLY LINE OF A 20 FOOT PERMANENT ACCESS EASEMENT PER CIRCUIT COURT OF COOK COUNTY CASE NO. 76L11684 ENTERED JULY 1,1977; THENCE SOUTH 5 DEGREES 26 MINUTES 15 SECONDS EAST ALONG SAID PARALLEL LINE 108.05 FEET; THENCE SOUTH 84 DEGREES 33 MINUTES 45 SECONDS WEST PERPENDICULAR TO THE LAST DESCRIBED LINE, 141.50 FEET TO A POINT ON THE EAST LINE OF THE SOUTH BRANCH OF THE CHICAGO RIVER AS ESTABLISHED BY ORDINANCE PASSED JULY 8, 1926; THENCE SOUTH 5 DEGREES 26 MINUTES 15 SECONDS EAST ALONG SAID EAST LINE 164.974 FEET; THENCE SOUTH 89 DEGREES 55 MINUTES 45 SECONDS EAST 315.078 FEET TO A POINT ON THE WEST LINE OF SOUTH WELLS STREET AFORESAID; THENCE NORTH 0 DEGREES 03 MINUTES 37 SECONDS WEST ALONG THE WEST LINE OF SOUTH WELLS STREET AFORESAID, 285.80 FEET TO THE HEREINABOVE DESIGNATED POINT OF BEGINNING, ALL IN COOK COUNTY, ILLINOIS.

PINS:  17-16-401-013-0000
       17-16-401-014-0000

ADDRESS OF PROPERTY: 800 S. WELLS ST., CHICAGO, ILLINOIS 60607

# EXHIBIT B

## PERMITTED EXCEPTIONS

1. REAL ESTATE TAXES FOR THE YEAR 2014, AND SUBSEQUENT YEARS, WHICH ARE NOT YET DUE AND PAYABLE.

2. SPECIAL SERVICE AREA NO. 12 ESTABLISHED BY ORDINANCE RECORDED AS DOCUMENT 91075841, AND ANY ADDITIONAL TAXES THAT MAY BECOME DUE AND PAYABLE UNDER THE TERMS OF SAID ORDINANCE AND SUBSEQUENT RELATED ORDINANCES.

3. AMENDED AND RESTATED GRANT AND RESERVATION OF EASEMENTS PERTAINING TO THE PROJECT COMMONLY KNOWN AS RIVER CITY, 800 SOUTH WELLS STREET, CHICAGO, ILLINOIS, DATED MARCH 14, 2001 AND RECORDED MARCH 28, 2001 AS DOCUMENT 0010245091, MADE BY RIVER CITY HOLDINGS, LLC, AN ILLINOIS LIMITED LIABILITY COMPANY, AMENDING AND RESTATING INSTRUMENT RECORDED MAY 12, 1999 AS DOCUMENT 99458079, AND THE TERMS, PROVISIONS, AGREEMENTS AND EASEMENTS CONTAINED THEREIN, INCLUDING THOSE RELATING TO COSTS AND COLLECTION OF AND LIENS FOR SAME.

   NOTIFICATION REGARDING AMENDED AND RESTATED GRANT AND RESERVATION OF EASEMENTS PERTAINING TO THE PROJECT COMMONLY KNOWN AS RIVER CITY, 800 SOUTH WELLS STREET, CHICAGO, ILLINOIS, DATED AS OF FEBRUARY 28, 2002 AND RECORDED MARCH 1, 2002 AS DOCUMENT 0020244622 MADE BY INVSCO MANAGEMENT COMPANY, INC., AN ILLINOIS CORPORATION.

4. RIGHTS OF THE UNITED STATES OF AMERICA, THE METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, THE STATE OF ILLINOIS AND THE CITY OF CHICAGO IN AND TO SO MUCH OF THE LAND, IF ANY, AS MAY HAVE BEEN FORMED BY MEANS OTHER THAN NATURAL ACCRETIONS AND IN AND TO SO MUCH OF THE LAND, IF ANY, AS MAY BE COVERED BY THE WATERS OF THE SOUTH BRANCH OF THE CHICAGO RIVER.

5. GRANT DATED AUGUST 15, 1933 AND RECORDED AUGUST 2, 1957 AS DOCUMENT 16974658 MADE BY THE BALTIMORE AND OHIO CHICAGO TERMINAL RAILROAD COMPANY, A CORPORATION OF ILLINOIS, TO THE SANITARY DISTRICT OF CHICAGO, A MUNICIPAL CORPORATION, RELATING TO THE PERPETUAL EASEMENT, PRIVILEGE, RIGHT AND AUTHORITY TO CONSTRUCT, RECONSTRUCT, REPAIR, MAINTAIN AND OPERATE AN INTERCEPTING SEWER UPON, UNDER AND THROUGH THE FOLLOWING:

   THAT PORTION OF BLOCK 85 IN SCHOOL SECTION ADDITION TO CHICAGO, A SUBDIVISION OF SECTION 16, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, AND OF THE FILLED OLD CHANNEL OF

THE SOUTH BRANCH OF THE CHICAGO RIVER, INCLUDED IN A STRIP OF LAND 20 FEET WIDE, EXTENDING FROM THE CENTER LINE OF THE NEW CHANNEL OF THE SOUTH BRANCH OF THE CHICAGO RIVER TO A LINE WHICH IS 144.5 FEET EASTERLY OF, MEASURED AT RIGHT ANGLES, AND PARALLEL TO THE EASTERLY LINE OF NEW CHANNEL; THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS:

BEGINNING AT POINT ON THE WESTERLY LINE OF NEW CHANNEL OF SAID RIVER 21.5 FEET NORTHERLY OF THE NORTH LINE OF TAYLOR STREET MEASURED ALONG SAID WESTERLY LINE OF NEW CHANNEL; THENCE EASTERLY MAKING AN ANGLE OF 90 DEGREES WITH SAID EASTERLY AND WESTERLY LINES OF NEW CHANNEL; ALSO

THOSE PORTIONS OF BLOCKS 85, 86, 87 AND 88 IN SAID SCHOOL SECTION ADDITION TO CHICAGO, INCLUDED IN A 16 FOOT STRIP OF LAND EXTENDING FROM THE NORTHERLY LINE OF ABOVE DESCRIBED 20 FOOT STRIP OF LAND TO THE SOUTH LINE OF WEST HARRISON STREET; THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN SAID CENTER LINE OF THE ABOVE DESCRIBED 20 FOOT STRIP OF LAND 130 FEET EASTERLY OF THE SAID EASTERLY LINE OF NEW CHANNEL; THENCE NORTHERLY ALONG A STRAIGHT LINE PARALLEL TO SAID EASTERLY LINE OF NEW CHANNEL, AND ITS EXTENSION NORTHERLY TO THE NORTH LINE OF POLK STREET; THENCE NORTHERLY ALONG A STRAIGHT LINE TO THE POINT OF INTERSECTION OF THE SOUTH LINE OF WEST HARRISON STREET AND THE CENTER LINE OF SOUTH FRANKLIN STREET; ALSO
ALSO A STRIP OF LAND 6.5 FEET WIDE LYING EASTERLY OF AND A STRIP OF LAND 1.5 FEET WIDE LYING WESTERLY OF, BOTH ADJOINING THE ABOVE-DESCRIBED 16 FOOT STRIP OF LAND AND EXTENDING FROM THE NORTHERLY LINE OF ABOVE-DESCRIBED 20 FOOT STRIP OF LAND TO A LINE WHICH IS 28 FEET NORTHERLY OF AND PARALLEL TO SAID NORTHERLY LINE OF SAID 20 FOOT STRIP OF LAND; ALSO

THAT PORTION OF SAID BLOCK 85 INCLUDED IN A STRIP OF LAND SIX FEET WIDE, EXTENDING FROM THE SOUTHERLY LINE OF THE ABOVE-DESCRIBED 20 FOOT STRIP OF LAND TO THE PRESENT NORTH LINE OF TAYLOR STREET, THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE CENTER LINE OF ABOVE DESCRIBED 20 FOOT STRIP OF LAND 141.5 FEET EASTERLY OF SAID EASTERLY LINE OF NEW CHANNEL; THENCE SOUTHERLY ALONG A LINE PARALLEL TO SAID EASTERLY LINE OF NEW CHANNEL.

6. PERMANENT EASEMENTS AS CONDEMNED BY THE METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, BY VESTING ORDER ENTERED OCTOBER 21,1976, IN CASE NUMBER 76 L 11684.

THE LAND AFFECTED BY CASE NUMBER 76 L 11684 IS DESCRIBED AS FOLLOWS:

(PARCEL B-PERMANENT EASEMENT)

THAT PART OF BLOCKS 85 AND 105 IN E. K. HUBBARD'S SUBDIVISION OF BLOCKS 5, 60, 66, 75, 85, 104, 105, 108, 109, 111, AND 112 IN SCHOOL SECTION ADDITION TO CHICAGO AND VACATED TAYLOR STREET EXTENDED IN THE WEST HALF OF THE SOUTHEAST QUARTER OF SECTION 16, TOWNSHIP 39 NORTH, RANGE 14 EAST, OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, DESCRIBED AS FOLLOWS:

COMMENCING AT THE SOUTHWESTERLY CORNER OF SAID BLOCK 85, SAID POINT ALSO BEING THE POINT OF INTERSECTION OF THE EASTERLY DOCK LINE OF THE SOUTH BRANCH OF THE CHICAGO RIVER AS ESTABLISHED BY CITY OF CHICAGO ORDINANCE DATED JULY 8, 1926 AND THE NORTHERLY RIGHT OF WAY LINE OF VACATED TAYLOR STREET EXTENDED; THENCE NORTH 07 DEGREE 01 MINUTES 41 SECONDS WEST ALONG SAID DOCK LINE 55.50 FEET TO THE POINT OF BEGINNING;
THENCE NORTH 82 DEGREES 58 MINUTES 19 SECONDS EAST, 87.00 FEET;
THENCE SOUTH 00 DEGREES 08 MINUTES 19 SECONDS WEST, 81.00 FEET;
THENCE SOUTH 86 DEGREES 08 MINUTES 19 SECONDS WEST, 77.01 FEET TO AFORESAID EASTERLY DOCK LINE;
THENCE SOUTH 07 DEGREES 01 MINUTES 41 SECONDS EAST, ALONG THE AFORESAID DOCK LINE 33.89 FEET;
THENCE NORTH 86 DEGREES 39 MINUTES 20 SECONDS EAST, 120.00 FEET;
THENCE NORTH 23 DEGREES 20 MINUTES 40 SECONDS WEST, 40.00 FEET;
THENCE NORTH 01 DEGREES 39 MINUTES 20 SECONDS EAST, 80.24 FEET;
THENCE NORTH 82 DEGREES 58 MINUTES 19 SECONDS EAST, 35.26 FEET;
THENCE NORTH 03 DEGREES 20 MINUTES 40 SECONDS WEST, 95.21 FEET;
THENCE SOUTH 81 DEGREES 39 MINUTES 20 SECONDS WEST, 162.05 FEET;
THENCE SOUTH 07 DEGREES 01 MINUTES 41 SECONDS EAST ALONG THE AFORESAID DOCK LINE 91.29 FEET TO THE POINT OF BEGINNING.

ALL AS SHOWN ON EXHIBIT B ATTACHED THERETO AND MADE A PART THEREOF.

(PARCEL A - PERMANENT ACCESS EASEMENT)

A 20 FOOT WIDE PERMANENT ACCESS EASEMENT LYING 10 FEET ON EITHER SIDE OF A CENTER LINE IN THAT PART OF BLOCK 85 IN E. K.

HUBBARD'S SUBDIVISION OF BLOCKS 5, 60, 66, 75, 85, 104, 105, 108, 109, 111 AND 112 IN SCHOOL SECTION ADDITION TO CHICAGO, AND ALSO BLOCK 86 IN SAID SCHOOL SECTION ADDITION IN THE WEST HALF OF THE SOUTHEAST QUARTER OF SECTION 16, TOWNSHIP 39 NORTH, RANGE 14, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS, SAID CENTER LINE DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE NORTHERLY RIGHT OF WAY LINE OF ROOSEVELT ROAD (AS ESTABLISHED BY CITY OF CHICAGO ORDINANCE DATED APRIL 5, 1911) AND THE EASTERLY DOCK LINE OF THE SOUTH BRANCH OF THE CHICAGO RIVER (AS ESTABLISHED BY CITY OF CHICAGO ORDINANCE DATED JULY 8, 1926);
THENCE NORTH 01 DEGREE 42 MINUTES 47 SECONDS WEST ALONG SAID DOCK LINE, A DISTANCE OF 9.94 FEET;
THENCE NORTH 7 DEGREES 01 MINUTES 41 SECONDS WEST, CONTINUING ALONG THE AFORESAID DOCK LINE, A DISTANCE OF 1034.75 FEET;
THENCE NORTH 81 DEGREES 39 MINUTES 20 SECONDS EAST, A DISTANCE OF 130.00 FEET TO THE POINT OF BEGINNING OF THE AFOREMENTIONED CENTER LINE;
THENCE NORTH 7 DEGREES 01 MINUTES 41 SECONDS WEST, A DISTANCE OF 650.00 FEET, MORE OR LESS, TO A POINT OF TERMINATION OF THE SOUTHERLY RIGHT OF WAY LINE OF POLK STREET.

THE SIDE LINES OF SAID EASEMENT ARE TO BE LENGTHENED OR SHORTENED TO BEGIN ON SAID 130.00 FOOT LINE EXTENDED AND TO TERMINATE AT THE SOUTHERLY RIGHT OF WAY LINE OF POLK STREET.

ALL AS SHOWN ON THE PLAT MARKED EXHIBIT "A" ATTACHED THERETO AND MADE A PART THEREOF.

7. GRANT OF EASEMENT IN FAVOR OF THE BALTIMORE AND OHIO CHICAGO TERMINAL RAILROAD COMPANY AS CREATED BY GRANT RECORDED OCTOBER 12, 1983 AS DOCUMENT 26818404, AS MODIFIED BY MODIFICATION RECORDED DECEMBER 22, 1983 AS DOCUMENT 26905308, GRANTING A 16 FOOT EASEMENT FOR SINGLE RAILROAD TRACK AND SIGNALIZATION OVER AND UPON A 16 FOOT STRIP OF LAND AS SET FORTH THEREIN.

8. GRANT OF EASEMENT DATED FEBRUARY 26, 1988 AND RECORDED AS DOCUMENT 88089224 FROM FIRST WINTHROP PROPERTIES, INC. TO CABLE AND COMMUNICATIONS OF CHICAGO, INC. FOR A RIGHT OF WAY WITHIN THE LAND PURSUANT TO THE TERMS OF AN "OPERATION AGREEMENT: CABLE T.V. FOR RIVER CITY".

9. TERMS AND PROVISIONS OF SPECIAL PERMIT #434-84 GRANTED MARCH 30, 1984 BY THE CITY OF CHICAGO RELATING TO THE CONSTRUCTION, INSTALLATION, MAINTENANCE AND USE OF CAISSONS OVER THE PUBLIC WAYS (EAST BANK OF THE SOUTH BRANCH OF THE CHICAGO RIVER) ADJACENT TO THE INSURED PREMISES.

10. ENCROACHMENT OF 15 PLANTERS, APPROXIMATELY 5 FEET BY 5 FEET EACH AND LOCATED ALONG THE EAST LINE OF THE LAND, ONTO THE ADJOINING PUBLIC WAY, AS SHOWN ON SURVEY NUMBER N-123761 A, B & E PREPARED BY NATIONAL SURVEY SERVICE, INC., DATED FEBRUARY 26, 2001.

11. RIGHTS RELATING TO CHICAGO FREIGHT TUNNELS RUNNING NORTHERLY AND SOUTHERLY THROUGH THE LAND AT VARIOUS LOCATIONS AS SHOWN ON SURVEY NUMBER N-123761 A, B & E PREPARED BY NATIONAL SURVEY SERVICE, INC., DATED FEBRUARY 26, 2001.

12. EASEMENT AGREEMENT FOR RETAINING WALL TO BE ENTERED INTO BY AND AMONG 800 SOUTH WELLS PHASE II, LLC, RIVER CITY PRIVATE RESIDENCES CONDOMINIUM ASSOCIATION, AN ILLINOIS NOT-FOR-PROFIT CORPORATION, WRT-MARC RC, LLC, AN ILLINOIS LIMITED LIABILITY COMPANY, AND RIVER CITY MARINA FACILITIES, L.L.C., AN ILLINOIS LIMITED LIABILITY COMPANY AND RECORDED FOLLOWING COURT APPROVAL.